William Joyce, Counsel for Mr. Morander It's an honor to appear before you today. Typical of immigration cases, this particular matter is rather complicated, and it's a case that I've been working on for the last ten years in one form or another. And I do not believe in this case there's too much in the way of factual dispute, but it comes down to a number of concepts. And the case starts out back in 2007. Counsel, we know. We've read your briefs. Could you present your argument, please? So, okay. So the key issues here is whether res judicata in collateral estoppel would apply in this particular case. And the government says, no, you've missed the point entirely. There is a federal statute that assigns to the Court of Appeals the responsibility of determining questions of citizenship, at least for purposes of the bar to judicial review. And following a Tenth Circuit decision, your whole argument is beside the point. Well, that would be the government's... Yes, just as I said, it is the government's position. What's your response? Well, my response to that is that the government would choose to ignore the history of the case and argue that all that's before the court is whether or not he's a citizen or not, and that the court could make that determination and let it go at that. However, due process also suggests, I suggest a more constitutional argument, that if, in fact, the matter's been fully litigated previously in an administrative forum, and a judge had made the determination that Mr. Miranda was a citizen, that should be the end of it. It is the government. But the statute which assigns this responsibility to the Court of Appeals says nothing about giving deference to the administrative determination of this issue. And the facts are undisputed. So the way the government would characterize it is kind of a Hobbesian choice type situation. So the case has made it up to the circuit, and therefore the only issue that should be before the circuit is whether or not he's a citizen or not a citizen. And we would argue, by the way, even as it relates to that under the rules of Angola and the state of Massachusetts, that there's been no proof provided by the government that he's not a citizen. Can we talk about that? They say, well, the laws of both jurisdictions ended up treating children out of wedlock as though they were legitimate. And in any event, his father signed his birth certificate and acknowledged his paternity. And that that is sufficient to mean that he is not a United States citizen. So what's wrong with that? Well, we would argue that that's an incorrect analysis under the law. Why? Why is it incorrect? Because it needed to be some affirmation. The fact that they showed up at the, starting out back in, I believe it was 1978, at the Cape Verdean Embassy and signed the birth certificate was not sufficient under Angola law that existed at that point to meet the requisite requirements of paternity. And that also under the laws of Massachusetts, there needs to be some affirmation as well. You just can't rely on this birth certificate that was signed back in 1978 in Angola to somehow say that he's the legitimate father. He had no role in these children's lives. What does that have to do with acknowledging that he's the father? Lots of fathers, sadly enough, walk away from this. Well, the acknowledgement of signing a birth certificate is not sufficient. Why not? You need to do more. Looking at the two jurisdictions that would be involved in this case, Angola, in rule of law in Angola in 1978, and then rules in Massachusetts after they got here. Why do you exclude Cape Verde? I believe he was born in Cape Verde. No, he was born in Angola with Cape Verdean parents. I see. So that's another red herring that's floating around in this case. In the administrative courts, they talk about the Cape Verdean law. We would argue that Cape Verde is not applicable here. As a matter of fact, other than the fact that the parents are from Cape Verde, that there's no connection, no applicability of Cape Verdean law in this case. One of the things that makes this case, I would say, rather difficult is the law wasn't the clearest in the world in Angola in that time period. Cape Verdean law didn't apply, and that goes to the core. When we say there's no factual dispute, I mean his wife and his two sisters, by the way, just mentioning in passing, but for the fact that he didn't make it to that interview in 1996, he would have been a U.S. citizen because his two sisters who had very similar situations, they went ahead and naturalized. Frank was in custody at this point. Counsel, you've got to help me out because I thought I fairly well understood this case until I began to listen to your argument in regards to this matter. As I understand, and from reading your briefs, what you're arguing is that the IJ and the BIA had no authority to reconsider the race judicata issue where you're claiming that's over and done with, and yet the circuits that have addressed this issue, you're outnumbered, I think, two or three to one. Am I missing something here in regards? Regardless of what you said now, the question that you want us to say is that it's race judicata applies, therefore they have no jurisdiction over this matter. Well, why don't you lose on that issue alone based upon the other two circuits' decisions? On the issue, I think, again, it goes back to how you framed the question. You framed the question. I didn't. So race judicata collateral is toppled. If in fact the court chooses to say that a decision by an administrative tribunal is not sufficient, that does get us to, I would say, the second half of the argument, was namely whether or not he was legitimized under Rangel. You've got two problems here. You've got the problem that's already been identified first in regards to the statute, and then you've also got the race judicata problem. Correct. Do you agree with that? I agree that those are the issues. Okay. Thank you. And the first circuit has not ruled on the applicability of race judicata and collateral to stop an immigration-type proceeding. If they were to hold, I would submit to the fact that it is applicable, then the decision made by the immigration judge back in 2007 should be, I am arguing that that should be sufficient to put an end to this case. She can't come back five years later and re-litigate the exact same issue that was already decided once under the whole concept of finality and these equitable principles. Now, I know the government says that congressional intent and it's a flexible standard and that can trump what was already done in the lower court. That's her argument. But I argue that it's inappropriate, and the cases they cite to support this are clearly distinguishable. In this particular case, there was a five-hour hearing on the subject of whether he was or was not a citizen. There was a full vetting of the issue in Golden Law and Massachusetts law at the time, and the immigration judge concluded that that was it. Thank you, Mr. Joyce. Thank you. Mr. Bless. May it please the court, my name is Jesse Bless. I represent the Attorney General of the United States. It's certainly an honor to appear before such a distinguished panel. I think the court has nailed the issue, which is we have to look at this case through the lens of jurisdiction to determine the court's jurisdiction. The petitioner is removable by reason of having committed an aggravated felony. But to trigger the criminal alien bar under 8 U.S.C. 1252A2C, he says, well, I'm not an alien who is removable. I'm not an alien. Well, we need to determine whether he is, and Congress has bestowed upon this Court of Appeals by the plain language in the INA, 1252B5, which not only in Shepard but in this court in Pena recognize, gives the Court of Appeals the authority to determine de novo whether or not someone has made their case as a national of the United States. Suppose that, contrary to this record, the immigration judge and the BIA had found that he was a citizen. And then your argument, I think, would be the same. It doesn't matter. This is an issue that the Court of Appeals has to review and has to do so de novo? That's correct. Yeah. It would come. And what record would we look at? Well, it couldn't come through a petition for review because the government doesn't have the authority to file petitions for review. So, unfortunately, the Court of Appeals only sees those cases in which the government loses at the administrative level. And Congress obviously appreciated that. So it's only going to come from a denial of a nationality claim if the government has to live with an administrative decision. That being said, there is also a district court process, and it could come up that way and a good representation of, well, it's not a good example, but there are routes in which under 1421 where the cases go to district court and then there's an appeal, but that's not through a removability type case. That's through just an administrative appeal. Now that we've had the point of this court has plenary authority to consider the issue from the pleading submitted, there are three relevant, and again, legitimation is not something that is geographically bound under the applicable statute in this case. And it can be legitimation anywhere. And we do know it's not just the parents who are nationals of Cape Verde. The petitioners are nationals of Cape Verde. And the reason the parents in August 1978 went to the Cape Verde consulate is because that's where all the parties to sign the birth certificate is because everyone there was a national of Cape Verde. What is the basis of saying the petitioner himself was a national? Is that a reference to Cape Verde in law? No, Your Honor. That is in his visa and alien registration when he came to the United States, and that's at page 247 of the record, he's listed as a Cape Verdean national. I.e., that is the information that he gave them? That's exactly correct, Your Honor. And so that's really not disputed. In the notice to appear in this case, and the immigration judge's removal order removes him to Cape Verde. And there's no objection. There was never an objection to his nationality as a Cape Verdean national. And nor was there of the parents. And so they go to the Cape Verdean consulate or embassy and sign the birth registration, and the government's position is that was sufficient, that that simultaneous in-person signing of a birth certificate by the father is sufficient to legitimize the son under three applicable jurisdictions, not only Cape Verde, but Angola and Massachusetts as well. And therefore, he cannot meet his burden of establishing that he derived citizenship through his mother's naturalization as of 1995. I take it that so far as Cape Verdean law is concerned, although, as you put it, the father's act was sufficient, it was not actually necessary. Isn't that correct? You've hit a great point, Your Honor. He usually does. I'm not surprised. One keeps on trying. Okay, so the board, for purposes of deriving citizenship, the board has held that where countries have made every child in and out of wedlock equal, that that is sufficient for legitimation purposes for derivative citizenship. However, they've also recently held, and this is a matter of cross, that if the jurisdiction says everyone's equal, but then there's an additional requirement of acknowledgement, perhaps, then that is also required to meet the legitimation requirements. But we have that here. We have that here. And so even if that additional step is required, because Cape Verde is a jurisdiction where prior to the petitioner's birth they had equivocated all children, but there's some evidence that they may have also required acknowledgement. Equalized. Equalized, sorry. Not equivocated. I'm sorry. I apologize. No, I'm usually the one who's doing that. I'm sorry. They equalized the children, but even if there was an additional requirement, as we put in our brief, that required acknowledgement, the birth certificate is, I mean, this court recognized in PINA that the signed birth certificate under Cape Verde law is a full-blown legitimation. So I think, so we've. This seems enormously inefficient. We've spent years going through the IJBIA process, and then you get up here and we're told it's our de novo responsibility to make this determination. Why? Is there any explanation for why Congress would set up such a redundant, inefficient, time-wasting system? I guess I don't know. I mean, I think in terms of, if I can just bring this to citizenship, the reason why this court is the ultimate gatekeeper is because citizenship is so important. And I think they maybe appreciated how messy these things can be. You know, my colleague brings up the sisters. Well, we don't know if the father, maybe the father didn't legitimate the sisters but legitimated the son. We don't. And the evidence before the immigration judge in 2007, the immigration judge in 2007 did not have the evidence that this court has. And, in fact, the evidence that this court has isn't the evidence. I just wondered, is there anything in the congressional history about why this responsibility was given to us? I believe there is. I don't have that site before me. But I believe the Supreme Court recognized in Miller and Winn that the importance of citizenship was just too great a responsibility to not allow the gatekeepers in the Supreme Court to decide it plenary. I mean, it's that important. Okay. Thank you. I have no further. Again, thank you so much. Thank you.